PLAINTIFFS IN WINSTAR–RELATED CASES, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 95–660 C, 95–730 C to 95–732 C, 95–737 C, 95–769 C, 95–773 C, 95–779 C, 95–782 C to 95–784 C, 95–787 C, 95–790 C, 95–792 C to 95–794 C, 95–797 C, 95–799 C to 95–801 C, 95–803 C to 95–805 C, 95–807 C, 96–108 C and 96–202 C.

United States Court of Federal Claims.

Jan. 7, 1997.

Steven S. Rosenthal of Morrison & Foerster L.L.P., Washington, D.C., argued on behalf of all plaintiffs. Peter K. Rosen of Weisman & Rosen, Los Angeles, California, presented a supplementary argument on behalf of Leonard Shane, et al. (No. 96–108 C), and Richard H. Carlson of Anthony & Carlson, Oakland, California, presented a supplementary argument on behalf of Ariadne Financial Services (No. 96–202 C).

Shalom Brilliant, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, Department of Justice, Washington, D.C., and Thomas Segal, Office of Thrift Supervision, Washington, D.C., for defendant.

## OPINION

WIESE, Issue Judge.

### Introduction

In *United States v. Winstar Corp.,* —— U.S. ——, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the Supreme Court found the Federal Government liable to three savings and loan institutions for breach of contract stemming from Congress's enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). The Court ruled that the United States had entered into contracts permitting the institutions to use special accounting methods in regard to their acquisition of certain failing savings and loan associations, that the new capital requirements of FIRREA, as applied to the acquiring institutions, breached the terms of these contracts, "and that the Government is therefore liable in damages for breach." *Id.* at ——, 116 S.Ct. at 2440. The case was remanded to this court to determine the appropriate measure and amount of damages.

In this damages phase of the case, the three *Winstar* plaintiffs have been joined by over 120 other claimants who had entered into similar accounting-method agreements with the United States to facilitate their own acquisitions of failing savings and loan institutions ("thrifts"), and who now seek to recover contract damages from the Government under the *Winstar* holding. All *Winstar*-related cases have been made subject to special case-management procedures. *See* Omnibus Case Management Order, filed September 18, 1996. Pursuant to these procedures, the parties have agreed to the resolution of certain common issues, one of which is a defense grounded on the statute of limitations. *See id.* at 8–9.

The limitations issue arises in consequence of the Government's motion, filed September 9, 1996, to dismiss 26 of the *Winstar*-related cases for allegedly involving actions commenced here after the statute of limitations had run. The key question in resolving this issue is, at what point did plaintiffs' claims for breach of contract against the United States accrue?

*Factual Background*

At the encouragement of the Federal Government, plaintiffs, at various times in the 1980's, agreed to take over failing savings and loan institutions. These takeovers were designed to prevent the collapse of endangered thrifts and thereby avoid the heavy financial burden that would otherwise befall the Government as the insurer of the thrifts' deposit accounts.[1]

To make the takeovers financially attractive, the Government agreed to allow the acquiring thrifts to utilize special accounting methods involving the concept of "supervisory goodwill"—an accounting measure that refers to the excess of a purchase price over the fair value of all identifiable assets acquired. The Government allowed the acquiring thrifts to count this "excess" amount toward fulfillment of their reserve requirements. This accommodation was essential to the viability of the takeover transactions, since otherwise most of the acquiring thrifts, once saddled with the liabilities of the failing institutions, would themselves become immediately insolvent under the existing federal banking standards. Government regulators also agreed to allow the acquiring thrifts to amortize the goodwill asset over periods of up to forty years, an accounting concession that effectively allowed the thrifts to appear more profitable than they were.[2]

On August 9, 1989, in response to the savings and loan crisis, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989) (codified in various sections of 12 U.S.C.), as an attempt to restore public confidence in the thrift industry by strengthening the industry's precarious financial underpinnings. Although FIRREA significantly altered many aspects of the thrift industry's landscape,[3] the provision most relevant to this litigation was the requirement that the new Office of Thrift Supervision (OTS) "prescribe and maintain uniformly applicable capital standards for savings associations." 12 U.S.C.A. § 1464(t)(1)(A) (West Supp.1996). The substance of these capital standards was provided in the statute itself, including the requirement that a savings association "maintain core capital in an amount not less than 3 percent of the savings association's total assets." § 1464(t)(2)(A). "Core capital," in turn, was defined to exclude "any unidentifiable intangible assets," such as goodwill. § 1464(t)(9)(A). Through a "transition rule," the statute initially allowed thrifts to include the value of supervisory goodwill in satisfaction of up to one-half of the required core capital amount. However, the statute phased out this allowance completely as of January 1, 1995. § 1464(t)(3)(A). FIRREA also defined "qualifying supervisory goodwill" as supervisory goodwill existing on April 12, 1989, amortized on a straightline basis over the shorter of 20 years, or the remaining period for amortization in effect on April 12, 1989. § 1464(t)(9)(B).

FIRREA contained two sets of sanctions for institutions not in compliance with the new capital standards. For noncompliance occurring before 1991, the OTS Director was given discretion to restrict the asset growth of the thrift, and "beginning 60 days from promulgation of final regulations," to require any noncomplying thrift to submit a capital plan for approval by OTS. § 1464(t)(6)(A).

---

1. For a more detailed discussion of the development of the savings and loan industry and the events surrounding the acquisitions of the failing thrifts, see *United States v. Winstar Corp,* —— U.S. ——, ———–———, 116 S.Ct. 2432, 2440–46, 135 L.Ed.2d 964 (1996).

2. Although not legally significant to the issue here, a third incentive for the acquiring thrifts was the contribution of cash by the Government as a permanent credit to the thrift's capital. For a discussion of this incentive, as well as the methods involving the utilization of supervisory goodwill, see *id.* at ———–———, 116 S.Ct. at 2442–45.

3. FIRREA's other changes included: the abolishment of the FSLIC; creation of a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation (FDIC); replacement of the Bank Board with the Office of Thrift Supervision (OTS), which was given the responsibility of regulating all federally insured savings associations; and establishment of the Resolution Trust Corporation (RTC) to liquidate certain closed thrifts and their assets. *See id.* at ——, 116 S.Ct. at 2446.

For noncompliance occurring during or after 1991, the Director was required to prohibit any asset growth of the thrift (subject to a limited exception), and the thrift, at the same time, was required to comply with any capital enhancement directive issued by the Director. *See* § 1464(t)(6)(B). The Director was given the discretion to permit general exceptions to the new capital standards for a particular thrift. However, no such exceptions were to be effective after January 1, 1991. *See* § 1464(t)(8)(A). Although after that date a thrift could still obtain an exemption from noncompliance sanctions, the thrift was bound to observe limitations on its asset growth. *See* §§ 1464(t)(7)(A), (B).

To carry out the new capital standards, FIRREA provided that "[t]he [OTS] Director shall promulgate final regulations under this paragraph not later than 90 days after August 9, 1989, and those regulations shall become effective not later than 120 days after August 9, 1989." § 1464(t)(1)(D). The conference report directed that, "[u]ntil the capital standards required in the Act become effective, the capital regulations promulgated by the Federal Home Loan Bank Board remain in effect." H.R.Conf.Rep. No. 1278, 101st Cong., 1st Sess. 406 (1989). In this connection, in September 1989, OTS instructed thrifts to fill out their quarterly financial reports using whatever accounting methods they had used for the previous quarter's reports—reports filed before FIRREA was enacted. The memorandum accompanying the report forms from OTS stated that "[t]he September 1989 Thrift Report form is the same as the June 1989 Thrift Report form." Plaintiffs' Joint App. at 13.

On November 8, 1989, the Federal Register published an "interim final rule" from OTS setting "uniformly applicable capital regulations for savings associations," as required by FIRREA. 54 Fed.Reg. 46,845 (1989). Dated October 27, 1989, the rule included "requirements for minimum levels of tangible, core, and total capital for all savings associations." *Id.* The effective date of the rule was listed as December 7,

1989. *See id.* OTS appears to have incorporated the new standards in its instructions to thrifts filling out the quarterly financial reports in December 1989, directing that certain fields need not be completed, "[d]ue to the new capital regulation that is in effect beginning December 7, 1989." Plaintiffs' Joint App. at 14.

Ending any uncertainty as to the applicability of the new capital standards, OTS stated on January 9, 1990 that it "is applying the new capital standards to all savings associations, including those associations that have been operating under previously granted capital and accounting forbearances." Office of Thrift Supervision, *Capital Adequacy: Guidance on the Status of Capital and Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund,* Thrift Bulletin No. 38–2 (Jan. 9, 1990) (available on Westlaw at 1990 WL 309397) [hereinafter Thrift Bulletin No. 38–2].

As a result of these events, plaintiffs, all of whom had forbearance agreements with the Government stemming from their takeovers of failing thrifts, became subject to OTS-imposed sanctions under FIRREA for failing to meet the minimum capital requirements. Plaintiffs subsequently brought suit against the Government, alleging various combinations of Fifth Amendment takings and breach of contract causes of action, and now seek to recover under the *Winstar* holding. Twenty-six of the plaintiffs filed their complaints on or after September 29, 1995,[4] and that group is now subject to a motion to dismiss by the Government based on the statute of limitations.

*Defendant's Motion to Dismiss*

█ Every claim over which this court has jurisdiction "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C.A. § 2501 (1994). This six-year statute of limitations is "a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States,* 855 F.2d

---

4. Twenty-four of these plaintiffs filed between September 29, 1995 and December 7, 1995. The remaining two filed on February 22, 1996

(Shane), and April 16, 1996 (Ariadne Financial Services).

1573, 1577 (Fed.Cir.1988). Thus, if plaintiffs' claims accrued before September 29, 1989,—six years before the first suit was filed by this group of plaintiffs—the statute of limitations will have run, and all 26 suits must be dismissed for lack of jurisdiction.

Defendant argues that this, indeed, is the case, by asserting that all *Winstar*-related claims accrued on August 9, 1989,—the date of FIRREA's enactment. Plaintiffs, on the other hand, point to December 7, 1989,—the date OTS's implementing regulations became effective—as the earliest possible time of accrual. Alternatively, plaintiffs would postpone the time of claim accrual until the various occasions in 1990 when OTS enforced FIRREA sanctions against individual thrifts. The determination of the time of accrual will resolve the statute of limitations issue, and with it defendant's motion to dismiss.

Defendant's argument that plaintiffs' claims accrued upon FIRREA's enactment is based on several considerations, including the legislative history and practical import of the statute itself. First, however, defendant refers to the language earlier used by other courts in addressing the more basic question of whether the Government had breached its forbearance agreements with plaintiffs. The Federal Circuit, for example, in addressing the breach issue in *Winstar*, found that "the [FIRREA] legislation quite specifically abrogates agreements the government had made at an earlier time." 64 F.3d 1531, 1549 (Fed. Cir.1995). Other courts used similar language in finding that FIRREA breached the Government's agreements. *See, e.g., Franklin Federal Savings Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332, 1341 (6th Cir.) (concluding that "FIRREA abrogates the regulatory forbearance issued to Franklin by the [Board]"), *cert. denied,* 502 U.S. 937, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). According to defendant, these cases show that it was the enactment of FIRREA itself that was seen as the alleged breach of contract; hence, defendant contends, it is that event, rather than the subsequent issu-ance of regulations, that marks the point at which plaintiffs' claims accrued.

Defendant also points to FIRREA's legislative history as an indication that the terms of FIRREA were meant to abrogate the Government's forbearance agreements with plaintiffs. The legislative debates and procedural history surrounding FIRREA led courts to conclude that Congress, by enacting FIRREA, intended to change the capital standards for all thrifts, including those with forbearance agreements. *See, e.g., Ensign Financial Corp. v. FDIC*, 785 F.Supp. 391, 402 (S.D.N.Y.1992) ("We believe that when FIRREA's statutory language is read in light of FIRREA's legislative history, it becomes clear that Congress intended to abrogate the forbearance agreements."). The conclusions other courts have drawn from the language and legislative history of FIRREA lead defendant to assert that "it is beyond serious dispute that Congress abrogated these agreements when it enacted FIRREA."

Finally, defendant argues that FIRREA was not merely an anticipatory repudiation of the Government's forbearance agreements with the thrifts, but, rather, imposed immediate limits upon plaintiffs' use of supervisory goodwill in terms directly contradictory to those set forth in the agreements. Defendant points, for example, to FIRREA's requirement that core capital make up at least 3 percent, and tangible capital 1.5 percent, of a thrift's total assets. *See* §§ 1464(t)(2)(A), (B). Also, under the terms of the statute, thrifts could not include supervisory goodwill in calculating tangible capital, *see* § 1464(t)(9)(C), and could only include it in calculating core capital under a phase-out schedule that would prohibit its inclusion completely after December 31, 1994.[5] *See* § 1464(t)(3)(A). Thus, defendant would argue, any breach by the Government occurred through the terms of the statute, and was not contingent on any subsequent regulations. "From the day FIRREA was enacted," defendant asserts, "the affected institutions were not free to act in disregard of those restrictions that FIRREA expressly required

---

5. Defendant does not limit the immediate effect of FIRREA to its restrictions on supervisory goodwill, noting that the statute's minimum capi-tal standards also circumscribed any right to more lenient standards plaintiffs might claim un-der the forbearance agreements.

OTS to include in its regulatory standards." According to defendant then, any breach by the Government occurred upon FIRREA's enactment, regardless of the timing of subsequent regulations, and the statute of limitations therefore began running on August 9, 1989.

For the reasons set forth below, the court disagrees.

## Discussion

 As both parties recognize, a claim first accrues, within the meaning of section 2501, "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action," *Oceanic S.S. Co. v. United States*, 165 Ct.Cl. 217, 225, 1964 WL 8621 (1964), and "the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988). Thus, this court must determine at what point during the enactment and enforcement of FIRREA and its accompanying regulations plaintiffs became entitled to sue the Government for breach of contract.

### Prior FIRREA Litigation

Contrary to the assertions of defendant, the court does not find much useful guidance for this inquiry in the language of the *Winstar* courts. By selectively quoting excerpts from opinions at each stage of that litigation, defendant attempts to portray those courts as having conclusively established the statute's enactment as the time at which the Government's breach occurred. However, the portion of Justice Souter's plurality opinion in *Winstar* most pertinent to the accrual issue is most notable for its lack of a clear answer:

> When the law as to capital requirements changed in the present instance, the Government was unable to perform its promise and, therefore, became liable for breach. We accept the Federal Circuit's conclusion that the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA ..., the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating respondents' net worth.

*United States v. Winstar Corp.*, —— U.S. ——, —— – ——, 116 S.Ct. 2432, 2452–53, 135 L.Ed.2d 964 (1996). In the first sentence, Justice Souter seems to imply that the breach occurred at the time the law itself changed, while in the second, he portrays the breach as occurring when the regulatory agencies acted. Defendant attempts to explain away this ambiguity by proposing that both the statute's enactment and the agency action breached the forbearance agreements: "If OTS breached the contracts involved in *Winstar* by circumscribing the use of supervisory good will, the fact remains that FIRREA itself also circumscribed the use of supervisory good will...." This argument leads defendant into some dangerous territory, for if it were to convince the court that both events constituted breaches of contract, then plaintiffs likely could measure accrual from the moment of the most recent breach under the "continuing claim" doctrine. *See, e.g., Cherokee Nation of Oklahoma v. United States*, 26 Cl.Ct. 798, 803 (1992) (noting that "if defendant owes a continuing duty, a new cause of action arises each time the government breaches that duty"). In this case, however, only one breach is apparent.[6] The timing of that breach was irrelevant to the Supreme Court's reasoning—hence the ambiguity in Justice Souter's treatment—and thus was not established conclusively in the *Winstar* litigation.

Defendant's reliance on other cases following in the aftermath of FIRREA is similarly unhelpful in resolving the issue at hand. Defendant accurately points out that several courts have held, based on the statute's language and legislative history, that Congress intended FIRREA to eliminate the Government's forbearance agreements with affected thrifts. Among the cases referred to are: *Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision*, 951 F.2d 1093, 1098 (9th Cir.1991); *Franklin Federal Savings Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332, 1341 (6th Cir.), *cert. denied*, 502 U.S. 937, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991); *Guaranty Financial*

---

**6.** See the discussion of plaintiffs' argument regarding the continuing claim doctrine, *infra*.

*Services, Inc. v. Ryan,* 928 F.2d 994, 1006 (11th Cir.1991) and *Ensign Financial Corp. v. FDIC,* 785 F.Supp. 391, 402 (S.D.N.Y. 1992). These courts, however, were examining FIRREA's language and history in order to determine whether OTS had the statutory authority to apply FIRREA in a manner that violated the terms of thrifts' forbearance agreements. *See, e.g., Guaranty Financial Services, Inc.,* 928 F.2d at 1006 ("Not only is the OTS's interpretation that FIRREA eliminates contractual capital and accounting forbearances permissible, the legislative history unambiguously supports that interpretation.") Discerning the congressional intent behind FIRREA may help determine the propriety of subsequent agency action, but it gets us no closer to determining the moment of breach.

In any event, this line of analysis does not necessarily lead to a helpful resolution of the statute of limitations problem. Trying to discern a precise moment of "breach"—i.e., when the Government first acted in a manner inconsistent with the terms of the forbearance agreements—overly widens the scope of inquiry and obfuscates a more relevant question. As noted above, a claim does not accrue, and the statute of limitations does not run, until all of the events necessary to fix the Government's liability have occurred. At what point did those events occur in this case? Because the courts in *Winstar* and other FIRREA-related lawsuits have focused primarily on the existence of a breach, and the statute of limitations was not at issue, their analyses were divorced from this question. To answer the question presented here, the court must turn to the concept of ripeness. Pursuant to this line of inquiry, the timing of the complaints brought by plaintiffs Ariadne Financial Services and Shane necessitate that their arguments be addressed by the court separately from the arguments of those plaintiffs filing before December 8, 1995. The two groups will be addressed in turn.

*Plaintiffs Filing Before December 8, 1995*
*Ripeness:*

■ For a cause of action to accrue and the statute of limitations to run, the claim must be ripe. *See Biddison v. City of Chicago,* 921 F.2d 724, 728–29 (7th Cir.1991); *Massachusetts Bay Transp. Auth. v. United States,* 21 Cl.Ct. 252, 261 n. 12 (1990). Common sense, as much as case law, dictates this maxim, for the alternative would lead plaintiffs into a conundrum in which their claims could be time-barred before even becoming amenable to judicial resolution. Defendant correctly points out that "final agency action" is not a prerequisite to plaintiffs' claims becoming ripe. That specific requirement applies to suits brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C.A. § 704 (West 1996), whereas this suit is brought under the Tucker Act, 28 U.S.C.A. § 1491 (West 1994). However, ripeness in general is not a concept whose applicability is limited to the APA. Traditional notions of jurisdiction, while not strictly requiring "final agency action," still demand that a claim be a proper and appropriate subject for judicial resolution. *See Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1403 (9th Cir.1989) (holding that "ripeness is a jurisdictional requirement and lack of subject matter jurisdiction may not be waived"), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990). Here, the focal inquiry for this court in addressing the statute of limitations issue is to determine "the time when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." *Nager Electric Co., Inc. v. United States,* 177 Ct.Cl. 234, 240, 368 F.2d 847 (Ct.Cl.1966). Because plaintiffs obviously were not entitled to bring unripe claims to this court, ripeness is a key component in determining the moment of accrual.

■ Twenty-four plaintiffs filed suit more than six years after FIRREA's enactment, but less than six years after the OTS regulations took effect. For this group, defendant can win its motion to dismiss only if it convinces the court that plaintiffs' claims became ripe on the day the statute was enacted, thereby triggering the statute of limitations and barring any claim brought more than six years after that day. To do so, defendant must show that, despite the delayed timing of the implementing regulations and agency en-

forcement, FIRREA's enactment constituted an actual, not merely anticipatory, breach of plaintiffs' forbearance agreements with the Government.

■■■■■ An anticipatory repudiation "occurs when an obligor communicates to an obligee that the obligor will commit a breach in the future." *Kinsey v. United States,* 852 F.2d 556, 558 (Fed.Cir.1988). If FIRREA's enactment constituted a breach that was solely anticipatory, then plaintiffs' claims did not accrue until some subsequent action by OTS brought about an actual breach. When a party to a contract is faced with an anticipatory repudiation, "[t]he aggrieved party is entitled to sue either when the anticipatory repudiation occurs or at the later time for performance under the contract." Calvin W. Corman, Limitation of Actions § 7.2.1 (1991). So while he may sue, his decision to postpone suit until an actual breach occurs cannot be penalized through the running of the statute of limitations, for his claim has not legally accrued. As courts have recognized, at some point a largely anticipatory breach may be sufficiently "actual" to trigger the statute of limitations: "If, however, the breach is not wholly anticipatory because it involves some contractual nonperformance, the statute of limitations begins to run immediately." *Kinsey,* 852 F.2d at 558. Unless the enactment of FIRREA entailed, in itself, some contractual nonperformance, it was merely an anticipatory repudiation and cannot serve as the trigger point for the statute of limitations.

As plaintiffs point out, FIRREA contained several provisions, not relevant to this litigation, that were apparently self-executing and did not require implementing regulations. *See, e.g.,* § 1464(u). Under the paragraph setting forth the new capital standards, however, the OTS Director was instructed to "promulgate final regulations" within 90 days, to become effective within 120 days, of FIRREA's enactment. While the substance of these regulations may have added little to the terms of the statute itself, the promulgation of them appears to have been the triggering act for any application of the new capital requirements. *See* H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 406 (1989) ("Until the capital standards required in this

Act become effective, the capital regulations promulgated by the Federal Home Loan Bank Board remain in effect.") Despite the lag between FIRREA's enactment and issuance of the regulations, defendant argues that FIRREA's repudiation was not merely anticipatory because during that lag, "OTS cannot be said to have allowed what FIRREA required it to disallow." More specifically, defendant explains, "one cannot argue that in the interim OTS permitted the utilization of supervisory goodwill in accordance with the alleged agreements." *Id.* This is, however, precisely what OTS appears to have permitted.

For the fiscal quarter ending September 30, 1989, OTS instructed thrifts to fill out the required Thrift Report form in the same manner as they had for the quarter ending June 30, 1989. Apparently, this meant that thrifts were allowed to include supervisory goodwill in the computation of regulatory capital requirements in September 1989, after FIRREA's enactment, to whatever extent they had been allowed to do so in June 1989, before FIRREA's enactment. It was not until the December 1989 Thrift Report, after the OTS regulations had taken effect, that thrifts were instructed not to complete certain fields on the report due to "the new capital regulation." Plaintiffs' Joint App. at 13, 14. Thus, from the standpoint of statutory construction, FIRREA conditioned the implementation of its new capital standards on regulations that did not take effect until four months after the statute's enactment. And however dire the effects of FIRREA's terms were to be on thrifts after December 1989, before that date thrifts were effectively told by OTS to adhere to the status quo. Regardless of the fact that OTS was bound to follow FIRREA's terms when it issued its regulations, FIRREA itself merely communicated those terms, and the only means for application stood four months into the future. That those terms constituted an actual breach when applied to the thrifts cannot overshadow the fact that they were not so applied until the regulations took effect. FIRREA was essentially a legally binding forecast of a future breach of the forbearance agreements. Without any accompanying contractual nonperformance, FIRREA falls

well within the definition of an anticipatory repudiation.

Defendant raises two basic arguments for why FIRREA's enactment was an actual, not anticipatory, breach. First, defendant details the substantive provisions of FIRREA that limit the use of supervisory goodwill, asserting that "FIRREA itself circumscribed the rights that plaintiffs claim to have acquired pursuant to the agreements in question." Defendant fails to see that the content of FIRREA's terms is irrelevant to the accrual inquiry—what matters is not the substantive terms by which plaintiffs' rights were circumscribed, but the timing of the circumscription itself. Even assuming that FIRREA set forth terms that clearly contradicted the forbearance agreements, if those terms were not implemented until later, the moment of enactment did not constitute an actual breach. Until the actual implementation, there occurred no invasion of a legal right.

Defendant's second argument focuses on the "difference between the performance of specific acts and the process of coming into compliance with a required financial condition." While Congress can demand immediate compliance when its legislation focuses on specific conduct, the sweeping changes brought about in the new capital standards of FIRREA could only be achieved "over time." Thus, defendant concludes,

> [P]laintiffs may not have been required to *be* in compliance with FIRREA's capital requirements on the day FIRREA was enacted, but, from that day, plaintiffs had to conduct business in a manner that would *bring* them into compliance by the effective date of the regulations.

As defendant's argument unintentionally highlights, FIRREA did not legally require plaintiffs to act in any certain way before the effective date of the regulations. Until that time, plaintiffs could legally conduct themselves in accordance with the forbearance agreements, even if the agreements were directly contradicted by the terms of FIRREA. While common sense and business judgment would undoubtedly lead the affected thrifts to prepare to meet the new standards, this does not transform an anticipatory breach into an actual one. Many, if not most, anticipatory breaches lead the opposing party to prepare for an actual breach. But that preparation derives from common sense, not legal obligation, and until the opposing party actually breaches the contract, the cause of action has not accrued. Practically, Congress may not have been able to implement the new standards until thrifts had time to prepare for them; legally, however, until that implementation occurred, FIRREA's breach was anticipatory, plaintiffs' contract claims did not ripen, and the statute of limitations was not triggered. Thus, for the 24 plaintiffs filing suit before December 8, 1996, defendant's motion to dismiss is denied.

### *Plaintiffs Ariadne Financial Services and Shane*

*Ripeness:*

■ Postponing accrual until the effective date of the OTS regulations does not dispose of defendant's motion as to two of the plaintiffs, both of whom filed suit more than six years after OTS had both implemented new regulations under FIRREA (December 7, 1989) and advised thrifts that FIRREA eliminated their forbearance agreements (January 9, 1990).[7] To overcome the statute of limitations defense, these plaintiffs must show the court that their claims did not ripen until OTS applied FIRREA's sanctions to their individual thrifts, or until those thrifts pursued the exceptions available under FIRREA.

Although the factual circumstances of their claims differ, both plaintiffs Ariadne Financial Services ("Ariadne") and Shane argue that their claims did not ripen until OTS took direct, individualized action against plaintiffs' respective thrifts. Ariadne argues that until direct action was taken on April 18, 1990, "damage remained a speculative possibility which may or may not have occurred, depending wholly on which, if any, of a variety

---

**7.** *Shane* (96–108C) was filed on February 22, 1996, and *Ariadne Financial Services* (96–202C) was filed on April 16, 1996.

of discretionary actions was chosen by OTS for implementation." Shane, a shareholder in Mercury Savings & Loan, argues that "until the Government seized Mercury, the enactment of FIRREA merely created the potential that the Mercury shareholders would suffer damages because of the elimination of supervisory goodwill." Their characterizations of FIRREA's impact as "speculative" and "potential" are based, in turn, on OTS's power under FIRREA to grant thrifts limited exceptions to the statute's requirements and sanctions.

Despite plaintiffs' claims that they suffered no actual damages until OTS acted against them individually, harm was incurred well before that time. Once the OTS regulations took effect, thrifts were legally subject to new capital standards that were in direct contradiction to the terms of their forbearance agreements. As shown by the instructions accompanying the quarterly Thrift Report form for December 1989, thrifts' reporting requirements changed once the OTS regulations took effect. *See* Plaintiffs' Joint App. at 14. And, as clearly shown by OTS's announcement of January 9, 1990, thrifts with forbearance agreements were no longer allowed to rely on those agreements in the wake of FIRREA. *See* Thrift Bulletin No. 38–2, *supra*. Plaintiffs were left to operate under capital standards governed explicitly and exclusively by FIRREA. They were prohibited from including millions of dollars worth of supervisory goodwill—as their agreements expressly allowed them to do—in their efforts to meet the legally mandated capital standards. As governmentally regulated institutions, failure to meet those standards would place the thrifts' very existence into jeopardy. At this point, the Government's breach of contract was actual, and harm to plaintiffs was inherent and obvious. To argue that actual damages were not inflicted until the Government tracked down individual thrifts and imposed statutory sanctions on them ignores the harm occasioned by implementation of the statutory scheme itself.

If OTS's implementation of FIRREA caused harm to plaintiffs, the question then becomes whether the limited exceptions available under FIRREA prevented plaintiffs' claims from becoming ripe until they had pursued those exceptions. In other words, did the availability of statutory exceptions make plaintiffs' harm sufficiently speculative and hypothetical to justify postponing the accrual of their claims? Plaintiffs claim that before OTS took direct action against them, "the enactment of FIRREA merely created the potential" that they would suffer damages, and that they were "dwelling in a netherworld period where an exception or exemption, and thus no damage, was continually possible."

FIRREA provided that thrifts could apply to the OTS Director for two important exceptions to the new capital standards.[8] The first was a total exemption from the standards, potentially effective until January 1, 1991. *See* § 1464(8)(A). Under the second, a thrift not in compliance with the new standards could avoid various OTS sanctions, including possible restrictions on payment dividends and compensation, although restrictions on asset growth would still be imposed. *See* § 1464(7)(A), (B). Thus, one exception was temporary in duration, and the other partial in coverage. There was never any chance that thrifts could avoid FIRREA's capital standards completely; it was only a question of whether or not they could gain a temporary exemption from the standards, or escape certain sanctions. Especially after January 9, 1990, when Thrift Bulletin 38–2 announced that OTS would apply FIRREA to thrifts with forbearance agreements, plaintiffs knew that they were subject to the new capital standards. OTS had authority to delay compliance or withhold certain sanctions, but a blanket exemption of a thrift from FIRREA's impact was not within OTS's statutory authority.

---

**8.** A third exception was available, under which the OTS Director was given discretion to establish minimum capital levels for thrifts on a case-by-case basis. *See* § 1464(s)(2). However, the Director could only do so in a manner consistent with provisions setting forth the new capital standards and the sanctions for failing to comply with them. *See id.* Thus, the exception has little, if any, bearing on a thrift's ability to escape the impact of FIRREA's new standards.

Even if granting a total exemption from FIRREA were within the authority of OTS, it is doubtful that its availability would have been sufficient to postpone the accrual of plaintiffs' claims. As noted above, plaintiffs suffered harm at the moment they were made subject to FIRREA's more stringent capital requirements. The possibility of future exceptions does not negate the harm inherent in the Government's breach. Contrary to plaintiffs' assertions, it was the possibility of the exceptions, not the harm inflicted by FIRREA, that was hypothetical and speculative. The fact that a subsequent grant of exceptions by OTS might have affected the degree or timing of harm inflicted on plaintiffs does not change the accrual analysis. An exception might be relevant to the mitigation of damages, but does not neutralize the harm that was incurred from the moment of FIRREA's implementation. The extent of harm does not need to be fully or precisely known for a cause of action to accrue:

Because a cause of action subsists when the right exists to demand compensation for injury done to person or property, no matter how slight that injury, it is reasoned that the suit can be instituted at once even though the full amount of damages is not yet apparent.

Calvin W. Corman, Limitation of Actions § 6.1 (1991); *see also State of Alaska v. United States,* 32 Fed.Cl. 689, 700 (1995) ("[T]he statutory period begins to run when a claimant has suffered a compensable injury, not when he is finally able to calculate the precise quantum of his damages."). The future availability of limited exceptions under FIRREA cannot overshadow the present, unavoidable impact which the statute exerted on all thrifts with forbearance agreements, plaintiffs included.

Plaintiffs look to *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), as support for the argument that their claims did not ripen until they pursued FIRREA's available exceptions with OTS. In *Williamson County,* the Supreme Court addressed ripeness requirements in a regulatory takings context. In that case, the plain-

tiff argued that county zoning regulations had deprived it of its property under the Fifth Amendment. The Court did not reach the merits of the claim, ruling that it had been brought prematurely. The Court held that:

[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.

*Id.* at 186, 105 S.Ct. at 3116. The plaintiff had submitted a plan for developing its property to the zoning commission, which raised eight objections to the plan in finding that it was not in compliance with the zoning ordinance. The Court ruled that the claim was not ripe because the plaintiff failed, after the plan's rejection, to apply for variances from the ordinance, even though variances could only have been granted to five of the board's eight objections. *See id.* at 187–88, 105 S.Ct. at 3117.

Plaintiffs would argue that under *Williamson County,* the fact that they could not have totally avoided FIRREA's impact by applying for the exceptions does not eliminate the need to pursue them before bringing their cause of action. As the Supreme Court ruled with respect to zoning variances, a court would require plaintiffs to pursue any exceptions available under the regulatory scheme before their claim would be considered ripe. The OTS implementation of FIRREA would thus not have triggered the statute of limitations until plaintiffs had applied for both relevant exceptions, and the OTS had decided whether or not to grant them.

The fatal flaw in plaintiffs' analogy to *Williamson County* is its failure to acknowledge the crucial distinction between a claim for a Fifth Amendment taking and a claim for breach of contract. Under the Fifth Amendment, a person's right to use his property is limited in the face of Government action, and not all levels of Government interference or encroachment constitute a "taking." Whether or not a claimant has the right to compensation depends, in part, on the extent of damages to the claimant's property. "The

general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Hence, the judicial inquiry in a takings case properly focuses on the degree of harm, i.e. the extent to which the use of private property has been impaired by Government action. By contrast, a party to a valid contract has an absolute right not to have that contract violated. Thus, a claim for breach of contract hinges simply on whether or not an offending party unjustifiably withheld performance owed pursuant to a legally binding contract. Degree of harm has no place in the inquiry, unless calculation of damages becomes necessary.

In *Williamson County,* therefore, it made perfect sense for the Court to require the plaintiff to pursue available zoning variances before bringing its takings claim. Because determining the degree of harm to the plaintiff's property was crucial to the takings inquiry, a court's resolution of that claim could very well depend on whether or not certain variances were granted. The fact that the variances could mitigate the harm to the property is essential to the takings inquiry; the fact that they could not negate the harm in its entirety is irrelevant. The same logic does not hold, however, for plaintiffs' breach of contract claims. The fact that plaintiffs might have been able to mitigate their damages by pursuing FIRREA's exceptions is irrelevant to the breach of contract inquiry. The existence of the breach itself, not the degree of harm caused by the breach, is the essential component of plaintiffs' claims. Because the exceptions could not negate the initial harm of the breach itself, plaintiffs' claims were ripe regardless of whether they pursued FIRREA's exceptions.[9]

*Stabilization Doctrine* [10]

The stabilization doctrine was first enunciated in *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). In that case, the plaintiff brought a takings claim after his land had been flooded. If accrual had been measured from the moment his land became partially submerged, the claim would have been barred by the statute of limitations. However, the Court rejected this approach, ruling that it was natural for a flood victim "to postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck." *Id.* at 749, 67 S.Ct. at 1385. Because the "source of the entire claim"—the flooding of the plaintiff's land—was not a "single event," but was "continuous," the plaintiff was allowed to postpone suit until the situation became "stabilized." *Id.*

Recently, *Dickinson*'s reasoning has been applied in a contract context. In *Anaheim Gardens v. United States,* 33 Fed.Cl. 773, 776 (1995), developers of low-income housing brought a breach of contract claim against the Government stemming from the passage of legislation that prohibited the prepayment of mortgages. The developers had obtained federally insured mortgages, under which they were allowed, after 20 years, to prepay in full, even without the Government's per-

---

9. Because plaintiffs' complaints alleged that FIRREA constituted a taking under the Fifth Amendment, in addition to a breach of contract, they might understandably seek to raise those claims now to gain the benefit of the *Williamson County* analysis. However, because the *Winstar* ruling, which plaintiffs invoke as the basis for the Government's liability, was based on a finding by the Supreme Court that a valid contract existed between the Government and the thrifts, *see United States v. Winstar Corp.,* —— U.S. ——, ——, 116 S.Ct. 2432, 2440, 135 L.Ed.2d 964 (1996), plaintiffs are conceptually foreclosed from shifting the ground of analysis to the takings context. As a rule, a contract implicitly contains a promise to pay damages in the event of a breach. The Fifth Amendment, by contrast, provides a remedy under circumstances in which no other remedy is available, and thus does not address plaintiffs' injury, which is redressable in contract. "The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other." *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925) (quoting *Jones v. United States,* 1 Ct.Cl. 383, 384, 1865 WL 1976 (1865)).

10. Because 24 of the plaintiffs have avoided dismissal on the ground that FIRREA's enactment constituted merely an anticipatory repudiation, plaintiffs' remaining arguments need only be applied to the claims of plaintiffs Ariadne and Shane.

mission. In return, the developers had agreed to abide by affordability restrictions imposed by the Government. A "temporary measure" passed by Congress imposed a moratorium on prepaying mortgages without the Government's consent, and two years later a second statute, functioning as a "permanent solution," reenacted the moratorium. *Id.* at 776. The developers initially brought only a takings claim, but then sought to add a breach of contract claim even though, if accrual were measured from the enactment of the first statute, their contract claim would be barred by the statute of limitations.

The court rejected this approach for two reasons, both relating to the stabilization doctrine. The court ruled that the plaintiffs' claims could not have accrued until the second statute's enactment. "[P]laintiffs would not have been unreasonable to have forborne litigation until after they had learned what sort of 'permanent solution' Congress would devise." *Id.* at 776. The court also ruled that the claims could not have accrued until plaintiffs' prepayment rights were ripe—that is, until the 20-year period prescribed by the mortgages had expired. Before this time, "[a] plaintiff could not be expected to have been able to make even a rough estimate of its contract damage." *Id.* at 777. The court recognized that *Dickinson* concerned property rights under the Fifth Amendment, but reasoned that its application to the contract claim was "justified in the present case because the prepayment rights which plaintiffs wish to assert are inextricably linked to the property rights which plaintiffs have otherwise asserted in their taking claim." *Id.*

Both plaintiffs Ariadne and Shane invoke *Anaheim Gardens* in their attempts to postpone accrual of their claims until OTS took direct action against them. Shane phrases the argument this way: "As this court held in *Anaheim Gardens*, . . . the fact that newly enacted legislation might adversely affect a claimant cannot constitute actual damages under § 2501." Similarly, Ariadne wrote: "In effect, *Anaheim Gardens* recognizes that

a cause of action cannot accrue in the presence of merely speculative damages, a situation directly analogous to that faced by Ariadne on enactment of FIRREA." However, while *Anaheim Gardens* may appear supportive of plaintiffs' argument to the extent that the court applied the stabilization doctrine to a breach of contract claim, two fundamental distinctions preclude its extension to the facts of this case.

First, the plaintiffs' claims did not accrue upon enactment of the first statute in *Anaheim Gardens* only because that legislation was passed as a "temporary solution." The court viewed the first statute merely as an anticipatory repudiation because Congress could have withdrawn the moratorium when it enacted the permanent legislation. *See id.* Thus, as a settled matter of law, discussed *supra*, accrual would not occur until the second statute's enactment made the breach actual.[11]

Second, even under the reasoning of *Anaheim Gardens*, the claims of plaintiffs Ariadne and Shane were sufficiently definite to have accrued before OTS acted directly against them. The court in *Anaheim Gardens* nowhere suggests that those plaintiffs needed to wait for the enforcing agency to deny them their prepayment rights individually before their breach claims could be considered ripe. Rather, the court reasoned that accrual upon the first statute's enactment was premature because the plaintiffs had no way of knowing what Congress's "permanent solution" would be, *id.* at 776, and many of the plaintiffs could not yet even exercise their prepayment rights under the mortgage agreements. *See id.* at 777. In short, there was neither a present injury nor any certainty of a future injury.

 In this case, plaintiffs Ariadne and Shane stood in a much different position in evaluating their own causes of action, given that they faced: a "permanent" statute, FIRREA, that explicitly stated that the accounting value of supervisory goodwill would

---

11. In addressing whether plaintiffs' contract claims were barred by the statute of limitations, the court in *Anaheim Gardens* needed only to decide whether accrual occurred upon the enactment of the first statute, or at some point thereaf-

ter. Thus, the court did not address the primary question facing this court: whether accrual of the plaintiffs' claims would occur upon enactment of the statute, or at the effective date of the enforcing agency's implementing regulations.

be wiped out, *see* § 1464(3)(A); regulations promulgated by OTS explaining how the agency would implement the statute, *see* 54 Fed.Reg. 46,845 (1989); and a bulletin from the agency expressly stating its intention to apply the statute to plaintiffs with forbearance agreements. *See* Thrift Bulletin No. 38–2, *supra*. And as noted above, the potential future grant of a partial exception to FIRREA's sanctions cannot be allowed to overshadow the certainty and immediacy of the impact which the statute and regulations had on plaintiffs. The stabilization doctrine was not created to be applied to every situation in which damages have not yet been written in stone. Rather, it is limited to those cases in which a plaintiff could not rightfully be expected to bring suit until the process giving rise to a claim—be it flooding, as in *Dickinson*, or incrementally enacted legislation, as in *Anaheim Gardens*—reached completion. Contrary to plaintiffs' argument, the fact that direct, individualized agency enforcement has not yet occurred does not mean that a claim has not "stabilized" for accrual purposes.

*Continuing Claim Doctrine*

▇▇▇ Under the continuing claim doctrine, "if defendant owes a continuing duty, a new cause of action arises each time the government breaches that duty." *Cherokee Nation of Oklahoma v. United States*, 26 Cl.Ct. 798, 803 (1992). If one of those breaches falls within the period prescribed by the statute of limitations, the doctrine "permits a plaintiff to defer litigious action until the termination of [the] continuing wrong, and thus spares plaintiff from having to pursue multiple actions." *Id.* Plaintiffs Ariadne and Shane argue that their causes of action constitute continuing claims, thus postponing accrual until after the final breach of the Government's continuing duty—when OTS acted directly against their thrifts. Their argument, however, misconstrues the nature of their own causes of action in light of relevant caselaw.

When a court has applied the continuing claim doctrine in the past, the case has always involved a series of distinct events, each causing harm to the plaintiff and each classi-fiable as a separate "breach" of the defendant's "continuing duty" to the plaintiff. *See, e.g., Applegate v. United States*, 25 F.3d 1579, 1584 (Fed.Cir.1994) (rejecting application of continuing claim doctrine because the case "does not involve a string of distinct events"); *Burich v. United States*, 177 Ct.Cl. 139, 366 F.2d 984, 986 (Ct.Cl.1966) ("This court has long adhered to the view that a suit for compensation due and payable periodically is, by its very nature, a 'continuing claim' which involved multiple causes of action, each arising at the time the Government fails to make the payment alleged to be due."), *cert. denied*, 389 U.S. 885, 88 S.Ct. 152, 19 L.Ed.2d 182 (1967). The cases which plaintiffs look to for support fall squarely within this paradigm.

In *Massachusetts Bay Transp. Auth. v. United States*, 21 Cl.Ct. 252 (1990), the plaintiff brought a variety of claims against the Government stemming from the performance of a construction contract. The court granted the Government's motion to dismiss for lack of subject matter jurisdiction as to aspects of several claims that were not yet ripe. Although the court did not address the continuing claim doctrine explicitly, it did note that the plaintiff could have waited to file suit until all of its claims were ripe without losing its earlier accruing claims to a statute of limitations defense. *See id.* at 261 n. 12. Instead of resorting to "piecemeal litigation," the court implied that plaintiff could have brought all of the claims at once, regardless of how much earlier some of them had accrued, as long as they all arose from the relevant transaction with the Government. *Id.* As established above, the claims of plaintiffs Ariadne and Shane had ripened at the time the OTS implementing regulations took effect. A court could have heard their causes of action once the Government's breach became actual, and thus there was no need to postpone suit or to adopt the approach reflected in *Massachusetts Bay*.

The reasoning of *Cherokee Nation of Oklahoma v. United States*, 26 Cl.Ct. 798 (1992), is similarly unhelpful to plaintiffs' argument. In *Cherokee Nation*, an Indian tribe sued the Government for trespass, claiming ownership of certain riverbed lands. The Government

moved for dismissal, arguing that the alleged wrongs had first accrued at least 79 years beyond the limitations period. In applying the continuing claim doctrine, the court explicitly set forth the only view of the facts that could have led it to adopt that approach:

> The court has consistently treated each alleged trespass in the instant case *as its own individual wrong*. Therefore, all events that fix the government's alleged liability are not in existence for each new trespass until such trespass actually occurs, and plaintiff knew or should have known of the existence of such trespass.

*Id.* at 803 n. 4 (emphasis added). Because some of the trespass claims thereby accrued within the statute of limitations period, the plaintiff was given the opportunity to revive the potential trespass claims that would have accrued beyond the period. *See id.* at 803.

In sharp contrast with *Cherokee Nation* and other cases in which the continuing claim doctrine has been applied by the courts, plaintiffs Ariadne and Shane did not face a series of breaches by the Government. Although more than one single event has made up the factual timeline at the center of this court's inquiry, the relevance of those several events is limited to establishing the timing of the accrual of plaintiffs' claims. There has never been any suggestion that those events, whatever their number, constituted more than one single breach by the Government, regardless of its timing. When OTS denied plaintiffs' individual attempts to include supervisory goodwill in meeting capital requirements, such denial did not give rise to a separate cause of action for breach. Rather, OTS was simply enforcing the breach that arose upon the enactment of FIRREA and its implementing regulations. Once that breach occurred, the Government became liable for any reasonably foreseeable damages suffered by plaintiffs as a result.[12] However, the Government did not subject itself to facing, into perpetuity, a new cause of action every time an act was performed pursuant to the statutory scheme that gave rise to the breach in the first place.

*Judicial Estoppel*

■ Plaintiffs argue that, "[b]ecause there can be no legitimate dispute that the Government's position here is completely inconsistent with its prior position or that this about-face was knowingly undertaken," defendant should be judicially estopped from arguing that plaintiffs' claims ripened upon the enactment of FIRREA. As plaintiffs acknowledge, however, neither this court nor the Federal Circuit has yet applied the doctrine of judicial estoppel to bar the Government from arguing inconsistent positions in regard to identical issues arising in separate actions. *See National Medical Enterprises, Inc. v. United States,* 28 Fed.Cl. 540, 546 n. 2 (1993).

■ Judicial estoppel "protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Id.* (quoting *Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 472 (6th Cir.1988). Defendant correctly points out that success in arguing the prior position by a party is a "critical prerequisite" to invoking the doctrine of judicial estoppel against that party, and cites several cases in full support of that proposition. *See, inter alia, Data General Corporation v. Johnson,* 78 F.3d 1556, 1564 (Fed.Cir.1996); *Water Technologies Corporation v. Calco, Ltd.,* 850 F.2d 660, 665 (Fed.Cir.), *cert. denied,* 488

12. In its brief, plaintiff Ariadne expressed concern that, if it had been forced to bring suit earlier, the concept of *res judicata* would have precluded them from recovering subsequently incurred damages. (Ariadne Brief at 10) This is correct, as it is in most litigation contexts. The plaintiff has the burden of forecasting damages that likely will be incurred, and there was nothing to prevent plaintiffs from doing so here. Plaintiffs knew that, without being able to rely on their forbearance agreements (as OTS assured them they would not, in Thrift Bulletin No. 38-2), they would be forced to adhere to the new capital requirements as outlined in FIRREA and the OTS regulations. The possibility of statutory exceptions would only have been relevant as a potential mitigating factor, to be established by the Government. Under such circumstances, the damages estimation process would be no more difficult or speculative in this context than it is in countless lawsuits in which the specter of *res judicata* similarly looms over a party seeking a monetary recovery.

U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988).

Plaintiffs have found only one case in which defendant's previous position—that a thrift's claim was not ripe, even after the OTS regulations and Thrift Bulletin No. 38–2 were issued—was adopted by the court. *See Flagship Federal Savings Bank v. Wall,* 748 F.Supp. 742 (S.D.Cal.1990). However, in that case, the thrift brought a claim for injunctive relief in a district court against administrative agencies, which required a "formal agency action" to be taken before the court could review the claim. *See id.* at 747. As noted above,[13] such agency action is not a prerequisite to review of claims brought in this court pursuant to the Tucker Act. Thus, the Government's position in *Flagship Federal* is not necessarily inconsistent with its position here, and in any case is not relevant to the inquiry in this case. Without a showing by plaintiffs of more compelling circumstances, the general applicability of judicial estoppel to the Government's litigation practice in this court is not an issue that presents itself on these facts. And even assuming that estoppel could be applied by this court to determine a jurisdictional issue,[14] plaintiffs would not be entitled to that remedy in this case.

### Conclusion

Because the capital standards prescribed under FIRREA were not enforced until the OTS implementing regulations took effect, plaintiffs' cause of action did not accrue until that time. As such, defendant's motion to dismiss based on the statute of limitations is denied as to the 24 thrifts who filed suit in this court on or before December 7, 1995, but is granted as to plaintiffs Ariadne Financial Services and Shane.

---

**13.** See the court's discussion of plaintiff's ripeness argument, *supra.*

**14.** Defendant contends that judicial estoppel cannot be applied by this court to determine jurisdictional issues.