FRANCONIA ASSOCIATES, et al., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–381C.

United States Court of Federal Claims.

May 6, 1999.

Jeff H. Eckland, Minneapolis, Minnesota, attorney of record for plaintiffs.

Mark L. Josephs, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### INTRODUCTION

In this case, property owners who received low interest loans from the Farmers' Home Administration, in exchange for providing low-income rental housing in rural areas, have filed suit against the government alleging that the government breached the loan agreements and, as a result, took their property without just compensation. These wrongs allegedly occurred when Congress passed legislation (i.e., 1988 and 1992) that made prepayment of their loans significantly more difficult, whereas their original loan agreements had granted borrowers an unfettered prepayment right allowing them to terminate the contracts *at any time.* The government responds that of the forty-three (43) contracts at issue, thirty-four (34) are barred by the statute of limitations. 28 U.S.C. § 2501. On the other hand, the plaintiffs seek summary judgment on their breach of contract claim.

### FACTS

The thirty-one (31) plaintiffs here at bar have entered into loan agreements with the Farmers' Home Administration (FmHA), United States Department of Agriculture,[1] to provide rental housing for low- and moderate-income persons in rural areas. These agreements were made under the authorization of §§ 515 and 521 of the Housing Act of 1949, and all the agreements were entered into prior to December 15, 1989. 42 U.S.C. §§ 1485, 1490a. Under these contracts, the FmHA makes or insures loans to finance the construction of rural rental housing units in exchange for which property owners agree to

restrictions on the use of their property. The use restrictions include: (i) to accept only low- or moderate-income persons as tenants; (ii) to charge no higher rents than those permitted by the FmHA; (iii) to restrict their investment returns to a fixed percentage of their initial capital contributions; and (iv) to maintain certain cash reserves. 7 C.F.R. §§ 1944.215. These restrictions apply only until the indebtedness under the promissory notes is satisfied. The contract to provide low-income housing is documented by a promissory note, a loan agreement, and a real estate mortgage.

The FmHA included the following provision in the promissory notes executed by the owners as part of the contracts: *"Prepayments* of scheduled installments, or any portion thereof, may be made *at any time* at the option of Borrower." Def.'s Mot. Dismiss App. at 4 (emphasis added). This generous prepayment provision was only applicable, however, to owners entering into agreements *before* December 21, 1979 (pre–1979 loans). Plaintiffs entering into loans *after* December 1979 (post–1979 loans) were required to maintain the low-income affordability of the housing for a 15- or 20-year period following the date of the loan, *after which they were allowed to prepay their loans.* Furthermore, promissory notes contained another provision, as follows: "This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof." Def.'s Mot. Dismiss App. at 4.

Two subsequent statutes, in 1988 and 1992, affected plaintiffs' loans. First, in 1988, Congress amended the Housing Act by passing the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA). Pub.L. No. 100–242, 101 Stat. 1815, 1877 (1988), codified as amended at 42 U.S.C. § 1472(c). As to pre–1979 loans, ELIHPA considerably restricted prepayment entitlement by adding

---

1. The Secretary of Agriculture, pursuant to Congressional authorization in 1994, has established a successor agency to the Farmers Home Administration known as the Rural Housing and Community Development Services (RHCDS). In 1996, the RHCDS changed its name to Rural Housing Service (RHS). In this opinion, we will refer to the FmHA to include the Farmers Home Administration and its successor agencies.

limiting procedures for prepayment. Specifically, ELIHPA restricted the prepayment option by: (i) requiring the Secretary to make "reasonable efforts" to enter into an agreement with the borrower to extend the low income use of the housing for not less than a 20-year period starting from the date of the agreement; and (ii) if such an agreement cannot be entered into, the Secretary shall *require* the borrower to sell the housing to a qualified nonprofit organization at a fair market value as determined by two independent appraisers. Pub.L. No. 100–242, § 241, 101 Stat. 1815, 1886 (1988) (prior to 1992 amendment). The purpose of the 1988 amendments was to place "those owners of projects placed in service *prior* to 1979 on 'the same playing field as those *post*–1979 projects who are *required* by law to keep their units low-income for 20 years." H.R.Rep. No. 100–122(1) at 55, *reprinted in* 1987 U.S.C.C.A.N. at 3317. In the "Findings" section of the 1988 legislation, Congress included this statement:

> [U]ntil the Congress can act on recommendations that will emerge from this review [a proposed major review of alternative responses to loss of affordable housing], *interim measures* are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

Pub.L. No. 100–242, § 202(a)(10), 101 Stat. at 1878 (1988) (emphasis added). Finally, the legislation also included a "sunset" provision which provided that subtitles B and D of the Act would be repealed on February 5, 1990. *Id.* at § 203(a). Subtitle B deals with prepayment of mortgages insured with the Department of Housing and Urban Development (HUD) under the National Housing Act, 12 U.S.C. § 1701 *et seq.,* and subtitle D deals with other prepayments not affecting those made on loans for low-income rural housing. 101 Stat. at 1878, 1890. Consequently, loans entered into with the FmHA are not subject to ELIHPA's sunset provision.

Several years later, in 1992, Congress enacted the Housing and Community Development Act of 1992. Pub.L. No. 102–550 § 712, 106 Stat. 3681, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c)). This Act amended the same section of the Housing Act, as was amended by the 1988 legislation, by extending the prepayment restrictions that had previously only applied to pre–1979 loans to all loans made *prior* to 1989. *Id.* Additionally, it allowed the Secretary to offer an additional incentive of allowing owners to receive rents in excess of those normally allowed to loan recipients in order to induce owners to enter into agreements extending the low-income use of the housing. 42 U.S.C. § 1472(c)(4)(B)(vi).

Plaintiffs initially filed this action on May 30, 1997, with an amended complaint filed on July 28, 1997. They allege two counts, to wit, breach of contract and a Fifth Amendment taking. For the breach of contract claim, they assert that the *1992 legislation* constituted an anticipatory repudiation of the contract between the government and each of the plaintiffs. Plaintiffs allege that the government's anticipatory repudiation constitutes a breach of their contracts "as of the date of Government performance required by each contract, i.e., the date that each plaintiff would terminate its contract but for the Government's repudiation." Compl. ¶ 51. On the taking claim, the plaintiffs claim that "defendant's conduct" constitutes a taking of their property, as of the date of government performance *required* by each contract. Compl. ¶ 54.

Subsequent to the filing of the complaint, the government filed a motion to dismiss the claims, based on *pre*–1979 loans, on the grounds that the statute of limitations has expired as to those claims. The government contends that it was ELIHPA, enacted in 1988, rather than the 1992 legislation, that affected prepayment rights on pre–1979 loan agreements, thus any breach of the *pre*–1979 loan agreements occurred on the *date of enactment* of ELIHPA, which was February 5, 1988. At that time, nothing else had to happen for plaintiffs holding *pre*–1979 loans to bring a breach of contract claim, thus plaintiffs' claims accrued at that date. Because the pre–1979 claims, here at bar, were not filed until May 30, 1997, which is not within 'six years of accrual, those claims on this record are time barred.

Plaintiffs then filed a motion for partial summary judgment seeking a ruling from this court on their first count, breach of contract through anticipatory repudiation. Specifically, plaintiffs wish this court to rule that the prepayment options were a material contract term, the government could not subject this contract term to inconsistent regulation, and that the 1992 legislation constituted an anticipatory repudiation of the contract because it restricted an owner's future exercise of the prepayment option.

The task before this court is, first, to determine whether *pre*–1979 loanholders' contract claims must be dismissed from the suit because their actions are time-barred. Even if all pre–1979 contracts are dismissed, however, we must still determine whether, as to post–1979 contracts, the government, by legislation, breached such contracts.

## DISCUSSION

### A. MOTION TO DISMISS–STATUTE OF LIMITATIONS

 The government seeks to dismiss the plaintiffs' claims on the grounds of lack of subject matter jurisdiction pursuant to the Rules of the Court of Federal Claims (RCFC) 12(b)(1) because their claims violate the statute of limitations. Suits against the United States are subject to a six-year statute of limitations. 28 U.S.C. § 2501. The six-year time bar on actions against the United States is "a jurisdictional requirement attached by Congress as a condition on the government's waiver of sovereign immunity." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir. 1988). Because the statute of limitations affects this court's subject matter jurisdiction—rather than being an affirmative defense—the requirement is strictly construed and under no circumstances may it be waived by the court. *Laughlin v. United States,* 22 Cl.Ct. 85, 99 (1990), *aff'd,* 975 F.2d 869 (Fed. Cir.1992); *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). If the motion to dismiss for lack of subject matter jurisdiction challenges the truth of the jurisdictional *facts* in the complaint, the court may look beyond the pleadings to consider all available evidence in order to determine jur-

isdiction. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991). Similarly, if the court has doubts regarding jurisdiction, it may look at all the evidence presented to satisfy itself regarding the jurisdictional facts. *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed.Cir.1998). Accordingly, mindful of plaintiffs' burden to establish the jurisdiction of this court as well as our own duty to ensure the legitimacy of our jurisdiction, we consider all the evidence presented for this court's consideration in evaluating the government's motion to dismiss.

 To prove that their claim is not time-barred, plaintiffs must show that their claim first accrued within six years of the filing of the complaint. *LaMear v. United States,* 9 Cl.Ct. 562, 569 (1986), *aff'd,* 809 F.2d 789 (Fed.Cir.1986). Under this threshold analysis, a claim first accrues when "all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland,* 855 F.2d at 1577. In other words, a claim has accrued when the last event transpires that gives plaintiffs a cause of action. For breach of contract claims, the claim generally accrues at the time of breach. *Brighton Village Associates v. United States,* 52 F.3d 1056, 1060 (Fed.Cir.1995).

### 1. The Accrual

Plaintiffs allege that the government breached the loan agreements by enacting legislation that deprived them of the prepayment option as it was expressly promised in the contract. They describe the government's action in enacting the legislation as an anticipatory repudiation of the contract. Secondly, they allege that the government has taken their property without just compensation, in violation of the Fifth Amendment, when it passed the legislation because the mere passing of the legislation, *ipso facto,* deprives plaintiffs of their vested right to prepay the loan and to lease their property on the open market. According to plaintiffs, therefore, the time of accrual for *both* the breach and the takings claims occurs on the date government performance is required by the contract. Government performance,

plaintiffs argue, occurs when the plaintiffs "would terminate its contract but for the Government's repudiation." Compl. ¶ 51. In other words, plaintiffs are arguing that the claims will accrue on a future speculative date when the property owners will seek to prepay, but because of the above legislation, the government will refuse the owners' proffered prepayment.

The government moves to dismiss both the breach and the takings causes of action as to those claims that are based on loans executed *before* December 21, 1979. Such claims, the government contends, are barred by the six-year statute of limitations. According to the government, ELIHPA, enacted in 1988, was *the* legislation that restricted the prepayment option for pre–1979 loans. Therefore, any breach of contract accrued in 1988. The government makes no contentions as to the actual accrual date of plaintiffs' takings claims. Therefore, we must determine for ourselves—because of our responsibility to ensure subject matter jurisdiction—whether the takings claim is time-barred. *See RHI Holdings, supra,* 142 F.3d at 1461.

Plaintiffs' first count, breach of contract, is defended against the running of the statute of limitations on the doctrine of anticipatory repudiation. Citing the *Winstar–Related* cases, plaintiffs claim that, under the law of anticipatory repudiation, the plaintiffs may choose to sue at the earlier of: i) the anticipatory repudiation, or ii) the breach. A plaintiff may postpone filing suit and not be penalized due to the running of the statute of limitations because the limitations period will not begin to run until an actual breach has occurred. *Winstar–Related Cases v. U.S.,* 37 Fed.Cl. 174, 183 (1997). The anticipatory repudiation here at bar, according to plaintiffs, occurred in 1992, when the later legislation was passed. This, they claim, marks the *earliest* time at which their claim could have accrued. Thus, six years hence, i.e., in 1998, would not bar the 1997 complaint filed here. The earlier 1988 ELIHPA legislation, plaintiffs contend, was only an "interim" measure such that plaintiffs were reasonable in waiting for Congress to enact a permanent solution before filing suit. For this proposition, they rely on *Anaheim Gardens,* decided in

this court, which stated that the 1988 legislation was merely a temporary measure such that property owners "would not have been unreasonable to have forborne litigation until after they had learned what sort of 'permanent solution' Congress would devise." *Anaheim Gardens v. United States,* 33 Fed.Cl. 773, 776 (1995). Under the doctrine of anticipatory repudiation, a prerequisite to a legal finding of *de jure* repudiation is a "positive, unconditional and unequivocal declaration of fixed purpose not to perform a contract in any event or at any time." *Dingley v. Oler,* 117 U.S. 490, 502, 6 S.Ct. 850, 29 L.Ed. 984 (1886). According to plaintiffs the 1988 legislation did not contain the necessary unequivocal declaration of repudiation. On the other hand, the 1992 legislation was such of an unconditional and permanent nature as to be an anticipatory repudiation. Thus, according to plaintiffs, the 1992 legislation, and not the 1988 legislation, constitutes the anticipatory repudiation.

Although 1992 marks the earliest, according to plaintiffs, that they could have sued, the statute of limitations does not begin to run until performance by the government becomes due. Here, plaintiffs claim, there is no duty of performance by the government until the time an owner "intends to exercise its termination option." Pl.'s Mot. Summ. J. at 32–33. Thus, if an owner never exercises its option, the government's anticipatory repudiation will never ripen into a breach of contract. It is unclear from the evidence before this court whether any plaintiffs have tried to exercise their prepayment right. Indeed, plaintiffs argue that an attempt to prepay is not required because it would be futile—given the statutes passed by Congress—and the law does not require a plaintiff to do that which is futile. Plaintiffs arguments can be summarized as asserting that the six-year statute of limitations period commences at the later of: (i) the anticipatory repudiation occurring through the 1992 legislation, or (ii) the date upon which plaintiffs, but for the government's repudiation, would have exercised their prepayment options. We take each of these contentions in turn, i.e., (i) whether the 1988 or the 1992 legislation constitutes a permanent repudiation, thus marking the earliest point at which

the plaintiffs may sue, and (ii) whether, notwithstanding the legislative repudiation, the limitations period does not begin to run until plaintiffs request prepayment.

▮▮▮ Plaintiffs' characterization of the 1988 legislation as "interim" is based upon the "Findings and Purpose" section of the legislation. Pub.L. No. 100–242, § 202, 101 Stat. at 1877 (1980). Finding 10 states as follows:

[U]ntil the Congress can act on recommendations that will emerge from this review, *interim measures* are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

*Id.* at § 202(a)(10) (emphasis added). This statement, however, cannot be given the weight that plaintiffs ascribe to it. The general rule of statutory interpretation is that statutes, once enacted and "unless explicitly provided to the contrary ... continue in force until abrogated by subsequent action of the legislature." 2 *Sutherland Statutory Construction* § 34.01 (5th ed.1984). For a statute to be abrogated there must be an *explicit repeal* by later legislation, or an implied repeal by a later inconsistent provision, or, if the statute states conditions for repeal, the happening of the condition. *Id.* at § 34.02–34.03. Even if the words "interim measures" in the preamble to the 1988 statute were meant to characterize the duration of the legislation, rather than being an expression of the motivation behind the legislation, we must nevertheless accept the 1988 legislation as a fully-enforceable *de jure* statute until later repealed. Thus, the 1988 ELIHPA is a *permanent* repudiation because it is a "positive, unconditional and unequivocal declaration of fixed purpose" to restrict borrowers' ability to prepay their loans.

The permanent nature of the 1988 legislation as it affects prepayment of FmHA loans is also evidenced by contrasting the way it treats FmHA loans as opposed to HUD loans. The 1988 legislation provided a "sunset provision" [2] for that part of the legislation affecting the National Housing Act (i.e.,

HUD) loans. The sunset provision provides for the expiration of two subtitles, subtitles B and D of the Act, pertaining to HUD loans, after a two-year period from the legislation's enactment. Pub.L. No. 101–242 § 203(a) (1988). Subtitle C, entitled "Rural Rental Housing Displacement Prevention," was not included in this sunset provision. Because Congress has provided for the expiration of some sections of the Act but not others, we must conclude that Congress *intended that those sections of the Act pertaining to the prepayment of rural housing loans be permanent* legislation, at least until later legislation expressly repealed it.

This conclusion does *not* run contrary to our holding in *Anaheim Gardens.* In *Anaheim Gardens,* this court had concluded that "ELIHPA [the 1988 legislation] was enacted expressly as a temporary measure." 33 Fed. Cl. at 776. But in that case, the court was analyzing loan agreements made with HUD, rather than the FmHA. As stated earlier, the 1988 Act provided for a sunset provision in which restrictions on prepayments for the HUD loans would expire in two years. As to HUD loans, the court opined that ELIHPA was a temporary measure, later mentioning that the two-year "moratorium on prepayments" gave Congress time to devise a more permanent solution. *Id.* Because the case before us involves FmHA loans to which the sunset provision did not apply, the *Anaheim Gardens* characterization of the 1988 legislation is inapplicable. In short, this is a different case.

We are also mindful that our conclusion runs somewhat contrary to the Congressional declaration in the "Findings and Purpose" section of the Act that "interim measures are needed." First, we note that Congress did provide for "interim" measures with regard to HUD loans. Those measures expired after a two-year period. The comment that "interim measures" are needed does not necessarily apply to all the measures that Congress enacted in the 1988 legislation. Second, the "Findings and Purpose" section is very similar to "Policy" sections in other

---

**2.** A sunset provision in a statute specifies a date upon which the statute expires. Congress must take positive steps to allow the law to continue in existence by a certain date or it will cease to exist. *Black's Law Dictionary* (6th ed.1990).

legislation. Under canons of statutory construction, policy sections are not part of the substantive portion of the statute and "may not be used to create ambiguity." 1A *Sutherland Statutory Construction* § 20.12. Thus, to the extent that the characterization of "interim" can be applied to the FmHA loan provisions, this statement cannot change the substantive statute. As we have stated above, a statute is permanent until later expressly repealed. As of the time of the enactment of the 1988 legislation, the legislation was permanent, and the breach of contract, if any, occurred at that date, because the government's liability was fixed at that time.

For a more exact date as to when a claim accrued, we must consult the enacting regulations. *See Winstar–Related Cases,* 37 Fed. Cl. at 183–184 ("[u]ntil the actual implementation [of the legislation], there occurred no invasion of a legal right.") The 1988 legislation required the issuance of "final regulations" to carry out its measures. 101 Stat. at 1889. Furthermore, the 1988 legislation required that these regulations be issued within 60 days of the enactment of the legislation, with the regulations to take effect no later than 45 days from the date of issuance. *Id.* To allow the agency to promulgate such regulations in this short time period without running afoul of the Administrative Procedure Act's requirements for notice and comment on proposed rules, Congress allowed the agency to promulgate "emergency" rules. *Id.* Pursuant to this authorization, the agency issued "interim" rules without notice and comment on April 22, 1988 (53 Fed.Reg. 13,244 (1988)), with an effective date of May 23, 1988. The FmHA solicited public comment on a proposed final rule (55 Fed.Reg. 29,601 (1990)), but it never promulgated a final rule. Plaintiffs seem to argue that the fact that the FmHA only issued interim "emergency basis" rules rather than "final regulations," strengthens its view that the 1988 legislation was itself "interim." That is not the case. As we have previously illustrated, the 1988 legislation was in fact permanent. It also authorized the FmHA to issue emergency regulations because it required the FmHA to promulgate the regulations within a short time of the legislation's enactment. The nature of the regulations does not reflect upon the permanence of the enacting statute. Finally, the FmHA was working on a "final rule" and permitted public comment on its proposed rule. From the above facts, we can state that the plaintiffs' claim for breach of contract, if there was a breach, accrued on May 23, 1988, when the FmHA's regulations, issued pursuant to the enacting legislation, became effective. At that date, the government's liability was then fixed such that plaintiffs could have immediately brought suit. Because this suit was not filed until May 30, 1997, it was not brought within six years of accrual. And we so hold.

### 2. Anticipatory Repudiation

Plaintiffs argue in the alternative that, notwithstanding which legislation constitutes repudiation, under the anticipatory repudiation doctrine, the statute of limitations does not begin to run, on this record, until the later time for performance under the contract. *Winstar–Related Cases,* 37 Fed.Cl. at 183. As correctly stated by plaintiffs, *when* there has been an anticipatory repudiation, a plaintiff may choose to sue at the *later* of: i) the anticipatory repudiation, or ii) the breach. *Kinsey v. United States,* 852 F.2d 556, 558 (Fed.Cir.1988). There, determining when the statute of limitations begins to run, however, depends on when a plaintiff chooses to sue. In such case, the time of accrual of a claim, "depends on whether the injured party chooses to treat the anticipatory repudiation as a present breach." Calvin W. Corman, *Limitation of Actions,* § 7.2.1 (1991). For instance, when a plaintiff sues after performance is due by the repudiating party, i.e., after the actual breach, the "statute of limitations commences to run from the time fixed for performance rather than from the earlier date of repudiation." *Id.* But if a plaintiff elects to treat the anticipatory repudiation as a breach, "the accrual date of the cause of action is accelerated from time of performance to the date of such election." *Id.* According to plaintiffs, the statute of limitations is not triggered until performance is due by the government, which plaintiffs contend is when an owner intends to exercise its termination option.

Although plaintiffs have correctly stated the law regarding the running of the statute of limitations in an anticipatory breach situation, we disagree with their characterization of the government's required performance. Plaintiffs argue that the performance required of the government under the prepayment option is to accept a borrower's prepayment. In fact, the performance required of the government under the prepayment option is *to allow landowners* to prepay, meaning that an actual breach occurred at the time of the 1988 legislation rather than an anticipatory repudiation. In order to understand this conclusion, we must begin our analysis with the loan agreements at issue, focusing our attention on the prepayment option.

The prepayment option for pre–1979 loan agreements—the only agreements at issue in the government's motion to dismiss—is composed of a single sentence. This sentence reads: "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." Def.'s Mot. Dismiss App. at 4. A careful reading of this clause reveals that no performance by the government is required—it is merely a promise to allow the borrower to prepay at any time during the life of the loan. No conditions are attached to this promise. The government's performance, if it can be called that, is to keep its promise to allow borrowers an unfettered prepayment right. No further *performance* was required by the government under the terms of the prepayment clause. Thus the government's performance, in the pre–1979 loan agreements, extends *throughout* the life of the loan, because its promise endures for the life of the loan. In 1988, however, Congress enacted the legislation that withdrew this promise. As of 1988, therefore, borrowers could no longer prepay their contracts without first going through lengthy and onerous procedures. This was clearly in contravention of the government's clear promise to allow an *unfettered* prepayment right. We also note that this conclusion is in full accordance with *Adams v. United States*, a decision in this court on similar facts that held that because ELIHPA barred the FmHA from allowing loanholders to prepay at any time—the performance required of the government—the statute of limitations began to run from the enactment of ELIHPA. 42 Fed.Cl. 463, 473–74 (1998) (Horn, J.). Consequently, a cause of action arose in 1988 for the breach of its promise.

■ Plaintiffs' contentions that the repudiating legislation constitutes merely an *anticipatory* repudiation of a contractual right are wrong. Anticipatory repudiation occurs when a promisor communicates to a promisee that he will commit a breach in the future. *Kinsey v. United States*, 852 F.2d 556, 558 (Fed.Cir.1988). As its name implies, *anticipatory* repudiation is made by a promisor *before* his performance is due under the contract. 11 Williston on Contracts § 1312 (3rd ed.1978), citing *Gold Mining and Water Co. v. Swinerton*, 23 Cal.2d 19, 142 P.2d 22, 27 (1943). From this definition, we see that on the facts at bar there is no anticipatory repudiation. The performance required of the government was to keep its promise to allow borrowers an *unfettered* prepayment right; and this promise extended throughout the life of the loan agreements. With the 1988 legislation, the government broke its promise, ending its performance under the contract. Thus, it could not have anticipatorily repudiated because there was no performance due by the government under the contract. The breach thus occurred at the time of the legislation.

The above explanation of the effect of the 1988 legislation on the pre–1979 loan agreements squares with this court's decisions regarding a similar HUD loan. Under the HUD program, property owners were contractually entitled to prepay their loans only after 20 years from the date of their loan agreement. In *Anaheim Gardens*, cited frequently by plaintiffs, this court found that the 1988 legislation breached the contract of HUD borrowers. 33 Fed.Cl. at 776. The court found, however, that because the majority of the borrowers had not reached their 20-year anniversary date at the time the 1988 legislation was passed, they could not have suffered any damages. Not until "such date as a plaintiff *might have* exercised the contractual prepayment rights on which the proposed breach claim is based," could the bor-

rowers have suffered damages, such that the last act had occurred to render the government liable. *Id.* Under this reasoning, the court found that the statute of limitations would begin as of the date of enactment of the 1988 legislation or the 20-year anniversary date of the agreement, whichever was later. *Id.* at 777. The *Anaheim Gardens* decision is consistent with a theory of anticipatory repudiation. In *Anaheim Gardens,* the time for performance by the government—when it must allow prepayment—simply had not yet arrived. The HUD borrowers were entitled to treat the 1988 legislation as an anticipatory repudiation because the government's performance was not yet due. Thus they could also have waited to sue for breach of contract when government performance did come due, on the 20-year anniversary date of their loan agreements. In the case at bar, the government had promised the borrowers a prepayment right throughout the life of the loan starting with the inception of the loan. At the time of the 1988 legislation, the government was allowing prepayment, i.e., it was performing its part of the bargain. When the 1988 legislation broke its promise, the repudiation was not anticipatory; rather, it was an actual breach of contract.

Plaintiffs' position also makes little logical sense. They contend that the statute of limitations does not run until plaintiffs attempt to prepay and the government declines the prepayment. Yet plaintiffs also argue that because attempting to prepay is futile—given the repudiating legislation—they are not obliged to prepay in order to bring suit. Plaintiffs cite a Third Circuit case stating that the law, "which is eminently practical, does not require the doing of a vain thing." The cited case, however, is distinguishable, because there the plaintiff filed suit upon the anticipatory repudiation and within the limitations period from that repudiation. *Abdallah v. Abdallah,* 359 F.2d 170, 175 (3d Cir. 1966). When the court used the above-quoted language, it was stating that there was no necessity for the plaintiff to actually induce a breach if he was filing a breach of contract claim based on the repudiation. *Id.* In the case at bar, plaintiffs are essentially arguing that the statute of limitations has not begun

to run, which logically would mean that their claim has *not accrued.* Under an anticipatory repudiation theory, the alleged breach of contract must arise either from an anticipatory repudiation, or an actual breach of contract. The plaintiffs have not alleged any facts indicating that they have sought prepayment and been refused—the acts which under their theory are necessary to constitute a breach of the prepayment provision. Thus if their theory of breach of contract is anticipatory repudiation, their claim must be based upon the 1988 legislative repudiation; it cannot be based upon a breach that has not in fact occurred. Because this claim was not filed until May of 1997, it was not filed within six-years of repudiation and is therefore barred.

#### 3. Accrual of the Takings Claim

 Neither party has argued or briefed the issue of whether plaintiffs' takings claims accrues at the same time as the breach of contract claim. This court, nevertheless, can *sua sponte* take up the issue of whether the takings claim also meets this court's statute of limitations. *Celentano v. United States,* 41 Fed.Cl. 596, 606–607 (1998). Indeed, it is our duty to ensure that we have subject matter jurisdiction over the claims before us. In the takings claim, plaintiffs allege that the "defendant's conduct" constitutes a taking of their property, as of the date of government performance required by each contract. There is only one instance of "defendant's conduct" at issue—Congress's change of the prepayment option. As this action is alleged to have constituted a taking, the claim would have accrued at the time of the 1988 legislation, which, as discussed above, was when Congress by law changed the plaintiffs' prepayment rights. The discussion above, relevant to the breach of contract claim, is equally applicable to the takings claim. Therefore, for the same reasons expressed above, this takings claim fails because it was not filed within this court's six-year statute of limitations.

#### B. SUMMARY JUDGMENT

Plaintiffs seek summary judgment pursuant to RCFC 56(c) which provides for judg-

ment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." A "genuine dispute" is one in which a reasonable jury, or in this case, a reasonable judge, could return a judgment for the nonmovant. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party both to show that there is no genuine dispute as to any material fact and that it would be entitled to a directed verdict at trial. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In reaching a decision on summary judgment, the court is not to weigh the evidence, nor make credibility assessments, nor seek the truth of the matter. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Any doubt as to factual issues must be resolved in favor of the party opposing summary judgment to whom the benefit of all presumptions and inferences run. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Finally, summary disposition is appropriate if there is no genuine dispute over a *material* fact. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A material fact is one that might affect the outcome of the suit under the governing substantive law. *Id.*

In a summary judgment motion, the moving party bears the burden of demonstrating that there is no genuine issue of material fact. *Adickes,* 398 U.S. at 157, 90 S.Ct. 1598. This burden may be discharged if the moving party demonstrates that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The role of the judge is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

 Plaintiffs' partial summary judgment motion in the case at bar requests a judgment on the first count of their complaint to the effect that the government breached its contracts with plaintiffs when it established

regulatory measures inconsistent with a material term of the contracts. The regulations at issue deprive plaintiffs of their contractual right to prepay their indebtedness—thus terminating their contracts—before the expiration date of the 40- or 50-year contracts. In opposition to this motion, the government argues first that the prepayment provision of each contract was not a material term of the contract. Second, the government argues that the allegedly repudiating statute did not absolutely prohibit prepayment so that it does not constitute a breach of the contract. Finally, the government raises the unmistakability doctrine. Under this doctrine, which is a canon of contract construction, a governmental surrender of *sovereign* authority must be expressed in unmistakable terms in the contract. *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). In the contracts at issue here, the government argues that because plaintiffs cannot show that the government unmistakably surrendered its right to alter the contract through future legislation, the government cannot be subjected to damages for breach of contract. In fact, contends the government, the contract here states just the opposite when the contract included the following provision:

> It is understood and agreed by Borrower that any loan made or insured by the Government will be administered subject to the limitations of the authorizing act of Congress and the related regulations....

Def.'s Reply App. at 5. According to the government, Congress's amendment of the authorizing legislation was a contingency agreed upon in the contract, as reflected in the above-quoted language. Because future legislative changes were contemplated under the contract, the government cannot be liable in damages for breach of contract because of the changes.

The government does not contest any of the material facts that are currently before us.[3] Therefore, we have only to settle the

---

3. The only factual issue raised by the government centered around three plaintiffs—the government asserted that it could not find evidence of loan agreements entered into between the FmHA and

these three plaintiffs. According to plaintiffs' counsel, the three plaintiffs had entered into pre–1979 loan agreements. Because we have already determined above that those plaintiffs who en-

legal issues presented for our consideration. Moreover, if the government's contentions regarding the unmistakability doctrine are correct, i.e., in the loan agreements at issue, the United States government has not surrendered in unmistakable terms its sovereign right to later alter the agreement—then the plaintiffs' summary judgment motion fails as a matter of law, *even if* there was a breach of contract through legislation. Therefore, we consider it more prudent to pass on the government's contentions regarding the application of the unmistakability doctrine first. If we find that this doctrine is inapplicable or that an unmistakable promise was made by the government that said contract will not be subject to future contrary legislation, we will then consider secondarily the other issues of law, including breach of contract, that must be addressed before we can resolve plaintiffs' summary judgment motion.

### 1. Applicability of the Unmistakability Doctrine

█ The unmistakability doctrine was summed up in *Bowen v. Public Agencies Opposed to Social Security Entrapment,* in which the Supreme Court stated that "sovereign power ... governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). In the absence of an unmistakable promise to the contrary, all "contractual arrangements, including those to which a sovereign itself is a party, 'remain subject to subsequent legislation' by the sovereign." *Id.* (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 147, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982)). The underlying presumption is that contracts with the government will be subject to later contrary legislation unless there is a clear promise otherwise in the contract itself.

The most recent expansive discussion of this doctrine was in the Supreme Court's opinion in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In *Winstar,* three savings and loans

asserted a breach of contract resulting from Congress's enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). Prior to FIRREA, the plaintiff savings and loans had an agreement with the government that granted them favorable accounting treatment if they acquired failing thrifts. *Id.* at 847–48, 116 S.Ct. 2432. With the passage of FIRREA, the favorable accounting methods were eliminated. *Id.* at 856–58, 116 S.Ct. 2432. As a result, two of the three plaintiffs in *Winstar* were seized and liquidated by the government, while the third plaintiff was forced to engage in a massive recapitalization to stay afloat. *Id.* at 858, 116 S.Ct. 2432. They filed a claim for breach of contract asserting that the government, by passing FIRREA, had breached its contractual obligation to accord the thrifts favorable accounting treatment. *Id.*

The Supreme Court decision was, unfortunately, a plurality opinion—although seven justices agreed to the ultimate finding of government liability, there was no majority consensus on the reasoning behind the liability holding, including the scope of the unmistakability doctrine and whether it was applicable to the facts. Justice Souter wrote the plurality opinion of the court, joined by Justices Stevens, and O'Connor, with Justice Breyer concurring. While holding that the government was liable for breach of contract, the plurality came to this conclusion by finding that the unmistakability doctrine was *inapplicable* to the facts before them because they read the contracts to include a provision shifting *the risk* of future legislation to the government. *Id.* at 880–81, 116 S.Ct. 2432. Because these risk-shifting provisions did not prevent Congress from acting in its sovereign capacity to alter the terms of the contract but merely designated who would pay for the changes, the provisions did not implicate Congress's sovereign powers and thus the unmistakability doctrine was simply inapplicable to the contracts. *Id.* Thus, the four plurality justices believed that the unmistak-

---

tered into pre–1979 loan agreements must be dismissed from this suit, the factual dispute over whether these plaintiffs did in fact enter into loan agreements—which the plaintiffs admit are pre–

1979 loan agreements—is moot. This factual dispute is therefore not a genuine issue of material fact in plaintiffs' motion for partial summary judgment.

ability doctrine was inapplicable on the facts. On the other hand, Justices Scalia, Kennedy, and Thomas believed the doctrine was *applicable* and that an unmistakable promise that the contract would not be subject to later-arising legislation had been made by the government. *Id.* at 921, 116 S.Ct. 2432. These three justices thus concurred *in the judgment* finding the government to be liable. Dissenting Justices Rehnquist and Ginsburg found the doctrine to be applicable but found that *no unmistakable promise* had been made, disagreeing with the ultimate judgment against the government. *Id.* at 924–37, 116 S.Ct. 2432. Thus a total of five justices agreed on the applicability of the unmistakability doctrine to the facts.

To determine whether we should apply the doctrine to the case at bar, we rely on the fact that a *majority* of justices, five, in the *Winstar* case found the doctrine applicable, even though that holding did not produce the ultimate judgment in the case. The five justices that comprised the dissent and the concurring opinions believed that the plurality had misapplied precedent, which had "not made the availability of these sovereign defenses (as opposed to their validity on the merits) depend upon the nature of the contract at issue." *Id.* at 919, 116 S.Ct. 2432. The two dissenters, for instance, believed that the plurality had essentially restricted the doctrine, contrary to precedent, to situations where plaintiffs either seek (i) injunctive relief to hold the government to its alleged surrender of sovereign authority, or (ii) damages which would be the "equivalent of" an injunction or exemption to a changed law. *Id.* at 926, 116 S.Ct. 2432. The five justices agreed that courts could not make distinctions between claims in order to apply the unmistakability doctrine. *Id.* at 919, 926–27, 116 S.Ct. 2432. Moreover, the five justices found the unmistakability doctrine applicable even if the contract included a risk-shifting clause as found by the plurality. As stated by the two dissenting justices, the

unmistakability doctrine "has a role to play" in determining whether a risk-shifting term was in fact included in the contract. *Id.* at 930, 116 S.Ct. 2432. They believed that the unmistakability doctrine was a canon of construction to be used in interpreting all governmental contracts. According to the five justices, the plurality inappropriately interpreted the contract without applying the presumption of the unmistakability doctrine when it determined that the doctrine itself was inapplicable. *Id.* at 920–21, 930, 116 S.Ct. 2432.

Because a majority of the justices believed that the unmistakability doctrine must be used in interpreting all governmental contracts, we must understand that to be the controlling holding on the doctrine.[4] We will thus apply the unmistakability doctrine to the case at bar.

### 2. Whether an Unmistakable Promise was Made

 Under the unmistakability doctrine, we must first determine whether the contracts between the plaintiffs and the FmHA unmistakably preclude the government from subsequently exercising its sovereign power to alter prepayment rights. *See e.g., Yankee Atomic,* 112 F.3d at 1579. For the reasons outlined below, we hold that the FmHA loan agreements *do not* contain an unmistakable promise precluding the government from exercising its sovereign power to alter the prepayment rights.

The characteristics that make a promise unmistakable have often been described, but such promises are rarely found by the courts. An unmistakable promise has been characterized as having terms that "admit of no other reasonable interpretation." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). Even an ambiguous term of a contract will not be construed as a conveyance or a surrender of sovereign power. *Winstar,* 518 U.S. at 878, 116 S.Ct. 2432. An unmistakable promise

---

4. The view of the five justices in *Winstar* on the unmistakability doctrine has also been adopted as controlling by the Federal Circuit. *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1578–79 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998).

After concluding that the unmistakability doctrine applied on the *Yankee Atomic* facts, the court stated that "this conclusion respects the view of the five justices who stated that the application of the doctrine is unrelated to the nature of the underlying contracts." *Id.*

was, however, found by the three concurring justices in *Winstar.* They found this promise in the nature of the contract. The reason for the contract, the essential quid pro quo, they argued, was that the government was to regulate supervisory goodwill favorably in exchange for the savings and loans' acquisition of the failing thrifts. *Winstar,* 518 U.S. at 921, 116 S.Ct. 2432 (J. Scalia, concurring). Thus the contract itself was a promise to regulate favorably—to state that no unmistakable promise was made would be to render the contract an illusory promise. *Id.* (stating that "I do not accept that unmistakability demands that there be a further promise not to go back on the promise to accord favorable regulatory treatment.").

Under the facts of this case, there is no unmistakable language within the prepayment provision that waives the government's right to modify the prepayment terms through future legislation. It simply states that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." Def.'s Mot. Dismiss App. at 4. Elsewhere in the loan agreement, however, is the following clause: "This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof." Def.'s Mot. Dismiss App. at 4, 9. This is the only clause in the agreement that addresses the effect of future acts on the terms of the agreement. But this clause only refers to future *regulations,* not statutes. Federal regulations stem from federal agencies, and the above clause specifically refers to regulations of the Farmers Home Administration. From the plain words of the contract, we must conclude that this clause protects the contract from subsequent changes by the Farmers Home Administration. We cannot conclude, however, that this protection extends to future changes in law by Congress. Indeed, under the unmistakability doctrine, such an expansion of a contractual clause is prohibited. *See also Parkridge Investors Ltd. v. Farm-*

*ers Home Administration,* 13 F.3d 1192, 1198 (8th Cir.1994), *cert. denied,* 511 U.S. 1142, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994) (an exemption from future *regulations* does not exempt a contract from future *acts* of Congress). Thus, it cannot be read as an unmistakable promise by the government that it would not later change the terms of the agreement by future legislation.

There is also no unmistakable promise under the *Winstar* concurrence criteria. In the case at bar, the essence of the contract was for the borrower to receive a low-interest loan in exchange for agreeing to rent the property to low-income tenants. Although the prepayment provision was a material term of the contract—it is likely that some property owners might not have entered into the agreements had the prepayment terms been less generous—it was not the reason for the agreement. By definition, a prepayment provision is not going to be the purpose of a loan. Thus, the Winstar concurrence's criteria for an unmistakable promise are not met on the facts before us.

Because we find that there is no unmistakable promise by the government in the loan agreements to absolve the contract from further substantive legislation, the government has a defense to the claim that the government breached the loan agreements through subsequent legislation.[5] Therefore, plaintiffs' motion for partial summary judgment is DENIED.

## CONCLUSION

The government's motion to dismiss all claims, premised on breach of contract and takings, based on loans executed *before* December 21, 1979, is hereby GRANTED. Pursuant to RCFC 54(b), inasmuch as there appears to be no just reason for delay, the clerk shall dismiss the claims and enter judgment with respect to all claims based on loans executed *before* December 21, 1979.

Plaintiffs' motion for partial summary judgment on their claim for breach of con-

---

**5.** We need not consider the other defenses raised by the government. These defenses are: (i) that the prepayment provision of each contract was not a material term of the contract; and (ii) that

the allegedly repudiating statute did not absolutely prohibit prepayment so that it does not constitute a breach of the contract.

tract is DENIED because of the unmistakability defense. Therefore, two counts (i.e., breach of contract and a taking) from plaintiffs' complaint remain for trial on the merits as to those plaintiffs whose claims are based on loans executed *after* December 21, 1979. To the extent that defendant has not filed an answer to any of the surviving claims, it shall do so within twenty (20) days from the date of this opinion. In addition, the parties shall file a joint memorandum within fourteen (14) days from the receipt of this opinion advising the court how they wish to proceed regarding the remaining counts in each surviving claim.

IT IS SO ORDERED.